# GUTWEIN ET AL. v. EASTON PUBLISHING COMPANY

[No. 19, September Term, 1974.]

*Decided October 8, 1974.*

*Motion for rehearing filed November 4, 1974; denied November 6, 1974.*

The cause was argued before MURPHY, C. J., and SINGLEY, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Philip J. Tierney, General Counsel* and *Elizabeth Holst Tockman, Assistant General Counsel,* with whom were *Jacob J. Edelman* and *Edelman, Rubenstein & Levy,* on the brief, for appellants.

*C. Maurice Weidemeyer* and *Basil E. Moore, Jr.,* for appellee.

MURPHY, C. J., delivered the opinion of the Court.

This appeal from an order of the Circuit Court for Talbot County reversing an order of the Maryland Commission on Human Relations raises important questions regarding the reach of the Commission's jurisdiction and the scope of its enforcement powers.

Maryland Code (1972 Repl. Vol.) Art. 49B entitled "Human Relations Commission" makes provision in § 1 for a twelve-member Commission appointed by the Governor with the advice and consent of the Senate. The Commission is authorized by § 3 "to make such surveys and studies concerning human relations, conditions and problems as it may determine, and to promote in every way possible the betterment of human relations"; to recommend legislation; and to hold an investigatory hearing "[w]henever any problem of racial discrimination arises . . . [and] to resolve the problem promptly by the gathering of all the facts from all the interested parties and making such recommendations as may be necessary." Discrimination in places of public accommodation is made unlawful by § 11; discrimination in employment is prohibited by § 19; and discrimination in housing is prohibited by § 22. Section 12 provides for the filing and issuance of complaints by and with the Commission, alleging discrimination prohibited by the provisions of Article 49B. Section 13 requires that the Commission investigate such complaints and if probable cause is found to believe that a discriminatory act has been committed, the Commission is enjoined "to eliminate the discrimination by conference, conciliation and persuasion." Section 14 provides that, failing voluntary agreement to

eliminate the discrimination, the Commission shall hold a public hearing and require the respondent to answer the charges set forth in the complaint. Section 14 (e), authorizing the Commission to issue "Cease and Desist" orders, provides:

"If upon all the evidence, the Commission finds that the respondent has engaged in any discriminatory act within the scope of any of these subtitles, it shall so state its findings. The Commission thereupon shall issue and cause to be served upon the respondent an order requiring the respondent to cease and desist from the discriminatory acts and to take such affirmative action as will effectuate the purposes of the particular subtitle."

Section 15 authorizes the Commission to institute litigation in the equity courts to compel compliance with its orders.

In pursuance of the provisions of Article 49B, the appellant Gutwein, a white male, filed a complaint with the Commission on August 20, 1969, alleging that his employer, appellee Easton Publishing Co. (Easton), had unlawfully terminated his employment as a news reporter when it learned that his fiancee was black.[1] Following an investigation and evidentiary hearing, the Commission concluded, by order dated March 8, 1973, that Easton had unlawfully discharged Gutwein from his employment in violation of the racial discrimination provisions of § 19 (a) of Article 49B, which provide:

"It shall be an unlawful employment practice for an employer:

"(a) To fail or refuse to hire or *to discharge any individual,* or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of*

---

1. Easton employed Gutwein as a reporter for its weekly newspaper, the *Easton Star Democrat,* on August 4, 1969. His employment was terminated on August 21, 1969.

*such individual's race,* color, creed, sex, age or national origin." (Emphasis added.)

The Commission found from the evidence adduced before its hearing tribunal that Gutwein "was discharged [from his employment] for his association and relationship with his black girl friend." The Commission ordered that Easton pay Gutwein the amount of $557.16, representing six weeks' loss of pay, and $50 for moving expenses.

On appeal by Easton, pursuant to the provisions of the Administrative Procedure Act, Article 41, §§ 244-256A, the circuit court reversed the Commission's order, holding that because § 19 (a) only proscribed employment discrimination on account of "such individual's race," and since Gutwein's discharge from Easton's employ "involved not his own race, but rather his fiancee's," the provisions of the section were not applicable to Gutwein's termination. The court further held that while there was substantial evidence "that a major reason for Gutwein's termination was the employer's discovery that (he being white) his fiancee was black," the termination "was not discriminatory and . . . the employer has not been guilty of an unlawful employment practice." The court concluded that since Gutwein failed to prove any redressable injury, "compensatory damages could not have accrued."

The Commission and Gutwein each appealed, raising these questions:

1. Was the finding of an administrative agency that a white male was terminated from his employment because of his interracial association with a black female based upon substantial evidence?

2. Can a white male lawfully be terminated from his employment because of his interracial association with a black female?

3. Does the Human Relations Commission possess authority to award compensatory damages upon a finding of employment discrimination?

## (1)

The evidence before the Commission concerning the reason for Gutwein's termination from Easton's employment was in sharp conflict. There was substantial evidence to demonstrate that Gutwein's discharge was triggered by improper job performance, poor work ability, a slovenly appearance, a bad attitude, and deficiencies in his personal conduct unassociated with the race of his fiancee. There was other evidence, equally substantial if believed, tending to show that Gutwein's employment was ended when Easton learned of his relationship with his black fiancee in the town of Easton. The Commission found as a fact from the evidence adduced at the hearing that it was the latter reason which precipitated Easton's action in terminating Gutwein's employment. Being supported by substantial evidence, the Commission's finding should have been accepted by the circuit court. *See Grosman v. Real Estate Comm'n*, 267 Md. 259, 297 A. 2d 257 (1972); *Bernstein v. Real Estate Comm.*, 221 Md. 221, 156 A. 2d 657 (1959); Article 41, § 255.

## (2)

As heretofore indicated, § 19 (a) makes it an unlawful employment practice for an employer "to discharge any individual . . . because of such individual's race . . . ." Appellants maintain that this provision reaches racial discrimination however manifested and protects all persons from discriminatory practices. Easton maintains that the lower court was correct in concluding that it was the race of Gutwein's fiancee that triggered his termination, and not his own race, and that consequently § 19 (a) has no applicability to the facts of this case. We think instances of discrimination in employment involving, as here, the termination of a white complainant's employment because of his association with his black fiancee are plainly within the contemplation and coverage of § 19 (a). The race of Gutwein's fiancee was manifestly not the only reason for his dismissal; rather his employment was terminated because he was white and was intimately associated with a black

woman, a relationship so offensive to Easton as to cause it to discharge Gutwein from his position.[2]

### (3)

The enforcement powers vested in the Commission, contained in § 14 (e), authorize it to issue "an order requiring the respondent to cease and desist from the discriminatory acts and to take such affirmative action as will effectuate the purposes of the particular subtitle." The appellants claim that the purpose of this provision is "to make whole victims of discrimination as well as insure against future unlawful conduct." They contend that the Commission's authority to order "affirmative action" is identical to that contained in virtually all civil rights laws, state and federal, and that such laws have been interpreted "expansively" to permit the payment of compensatory damages to victims of discrimination.

We note at the outset that the "affirmative action" provision in § 14 (e) is tied to "the purposes of the particular subtitle." Section 17 of Article 49B sets forth the purpose of the subtitle on "Discrimination in Employment" as follows:

"It is hereby declared to be the policy of the State of Maryland, in the exercise of its police power for the protection of the public safety, public health and general welfare, for the maintenance of business and good government and for the promotion of the State's trade, commerce and manufacturers *to assure all persons equal opportunity in receiving employment* and in all labor management-union relations regardless of race, color, religion, ancestry or national origin, sex, or age, *and to that end to prohibit discrimination in employment* by any person,

---

**2.** Language identical to that in Section 19 (a) is contained in Title VII of the Federal Civil Rights Act, 42 U.S.C.A. 2000e-2(a). The United States Equal Employment Opportunity Commission has held that a white employee's interracial associations are protected by the statute. *See* EEOC Decision No. 71-1902, decided April 28, 1971, 3 FEP 1244; EEOC Decision No. 71-969, decided December 24, 1970. *See also* Langford v. City of Texarkana, 478 F. 2d 262 (8th Cir. 1973).

group, labor organization, organization or any employer or his agents." (Emphasis added.)

Neither § 17 or § 14 (e) speaks in terms of remedying the "effects" of employment discrimination, or of preventing economic loss, redressing individual rights or compensating victims of discrimination. Section 17 is plainly couched in prohibitory and not compensatory terms.

Unlike § 14 (e) of Article 49B, Title VII of the Federal Civil Rights Act has a separate enforcement provision (42 U.S.C.A. 2000e-5(g)) relating to discriminatory employment practices and the remedies authorized therein are court-enforced. The federal law provides:

"(g) If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and *order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay* (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), *or any other equitable relief as the court deems appropriate. . . .*"(Emphasis added.)

While the federal statute specifically provides for back pay awards, federal courts are divided over the question whether the statute authorizes payment of other compensatory damages. Those courts which hold that Title VII authorizes compensatory damages do so on the basis that the statute was designed "to restore those wronged to their rightful economic status absent the effects of the unlawful discrimination," *Rosen v. Public Service Electric & Gas Co.,* 477 F. 2d 90, 96 (3d Cir. 1973) or "to put the aggrieved party in the same position he would have been but for the defendant's illegal interference with the employer-employee

relationship," *Tidwell v. American Oil Co.*, 332 F. Supp. 424, 437 (D. Utah 1971). Those federal courts which hold that Title VII does not authorize compensatory damages have concluded that the statute grants only equitable relief, *Loo v. Gerage*, 374 F. Supp. 1338, 1341-42 (D. Hawaii 1974); or that an examination of the legislative history of the statute and of its legislative model — the National Labor Relations Act, 29 U.S.C.A. § 160 (c), and the damage provisions of the Fair Housing Act of 1968, 42 U.S.C.A. § 3612, demonstrate that Congress did not intend a damage remedy, *Van Hoomissen v. Xerox Corp.*, 368 F. Supp. 829, 835-38 (N.D. Calif. 1973); or that "the omission of any such provision in a statute which sets forth the types of relief which may be afforded to an aggrieved person must be deemed to have been intentional," *Howard v. Lockheed-Georgia Co.*, 372 F. Supp. 854, 856 (N.D. Ga. 1974).[3]

State statutes specifically authorizing the administrative agency to make an award of compensatory damages for wrongful discrimination have been construed in some instances to sanction money damage awards for mental anguish and humiliation.[4] In *State Commission for Human Rights v. Speer*, 29 N.Y.2d 555, 324 N.Y.S.2d 297 (1971), a housing discrimination case, the Court of Appeals of New York held that the statute empowering the Commission to require respondents "to take such affirmative action, including (but not limited to) . . . awarding of compensatory damages to the person aggrieved by such [unlawful] practice, as, in the judgment of the division, will effectuate the purposes of this article," sanctioned damage awards for mental anguish. In Massachusetts, the Commission is authorized by statute in housing discrimination cases to "award the petitioner damages not to exceed one thousand dollars . . . ." This statute was held to authorize an award of

---

**3.** One federal court has said Title VII authorizes punitive but not compensatory damages. Tooles v. Kellogg Co., 336 F. Supp. 14 (D. Neb. 1972).

**4.** Seven states and the District of Columbia *specifically* authorize courts or administrative agencies to make money awards for damages suffered as a result of unlawful discrimination. *See* BNA, Fair Employment Practice Manual, § 451.

money damages for humiliation in , *Massachusetts Commission Against Discrimination v. Franzaroli*, 357 Mass. 112, 256 N.E.2d 311 (1970). Other states having statutes evidencing a clear legislative intent to eliminate the effects of discrimination or specifically sanctioning back pay awards have construed such statutes to authorize compensatory damages. In *A. P. Green Services Division of Bigelow-Liptak Corp. v. State Fair Employment Practices Commission*, Ill. App. 2d, 312 N.E.2d 314 (1974), language empowering the Commission to order the respondent "to take such affirmative or other actions with respect to the complainant as will eliminate the effect of the practice originally complained of," was held to sanction compensatory damages. In *Williams v. Joyce*, 4 Or. App. 482, 479 P. 2d 513 (1970), the court, viewing similar statutory language, coupled with an extensive recitation of purposes relating to the rights, health and dignity of the individual complainant, held in a housing discrimination case that the Commission had power to award damages not only for out-of-pocket expenses but for mental anguish.[5]

In *Jackson v. Concord Co.*, 54 N. J. 113, 253 A. 2d 793

---

5. ORS ch. 659 provides that the commissioner shall issue "an appropriate cease and desist order against any respondent found to have engaged in any unlawful practice charged." ORS 659.010 spells out what is meant by a cease and desist order:

"(2) 'Cease and desist order' means an order * * * issued to eliminate the effects of any unlawful practice found, addressed to a respondent requiring him to:

"(a) Perform an act * * * reasonably calculated to carry out the purposes of ORS 659.010 to 659.110, eliminate the effects of an unlawful practice found, and protect the rights of the complainant and other persons similarly situated * * *."

ORS 659.022 states the purposes of ORS 659.010 to ORS 659.110, some of which are to "insure human dignity" and to "protect [the victim's] health * * * from the consequences of intergroup hostility, tensions and practices of discrimination." It says that:

"* * * To accomplish this purpose the Legislative Assembly intends by ORS 659.010 to 659.110 to provide:

"* * *

"(2) An adequate remedy for persons aggrieved by certain acts of discrimination because of race, religion, color, sex or national origin or unreasonable acts of discrimination in employment based upon age."

(1969), a housing discrimination case, the Supreme Court of New Jersey, considering a statute similar to the federal law,[6] concluded from the specific mention of a back pay award and a legislative intent to create an effective enforcement agency that money damage awards were permitted.[7] In 1973, this damage remedy was held to authorize a monetary award for pain and suffering. *Zahorian v. Russell Fitt Real Estate Agency*, 62 N. J. 399, 301 A. 2d 754 (1973).

Other state courts viewing enforcement provisions practically identical to those contained in the New Jersey statute have concluded that their statutes do not empower a Commission to award money damages for unlawful discrimination. In the most recent, *Ohio Civil Rights Commission v. Lysyj*, 38 Ohio St. 2d 217, 313 N.E.2d 3 (1974), a housing discrimination case, the Supreme Court of Ohio said:

"The authority to take 'affirmative action' may well include extensive powers to effectuate the purpose of the Civil Rights Acts, but, under existing statutory language, those powers are to be directed

---

6. The enforcement provisions of most state civil rights laws or fair employment practice acts follow the federal model by delineating the meaning of "affirmative action" and specifically sanctioning back pay awards.

7. The New Jersey statute provides:

"If, upon all evidence at the hearing the director shall find that the respondent has engaged in any unlawful employment practice or unlawful discrimination as defined in this act, the director shall state his findings of fact and conclusions of law and shall issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or extending full and equal accommodations, advantages, facilities, and privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act, and including a requirement for report of the manner of compliance. The director shall have the power to use reasonably certain bases, including but not limited to list, catalogue or market prices or values, or contract or advertised terms and conditions, in order to determine particulars or performance in giving appropriate remedy. * * *"

towards ending the unlawful discriminatory practice and securing compliance with the cease and desist order. If the General Assembly had intended to authorize the commission to grant compensatory or punitive damages, it would have been a simple matter to explicitly so provide, as was done elsewhere in the Act."

In *Zamantakis v. Commonwealth Human Relations Commission*, 10 Pa. Comm. 107, 117, 308 A. 2d 612, 616 (1973), it was said:

"As we view our role in this case, on this issue, we must determine whether *our* Legislature intended *our* Commission to award compensatory damages for 'humiliation and mental anguish.' We first note that in the Pennsylvania statute, there is no specific legislative language authorizing the Commission to award such damages. Next, we note that the statutorily provided proceeding is directed to be expeditious and informal, as are most administrative procedures. There are none of the formal trappings, evidentiary protections, and strict procedures of a court of law. In addition, the members of the Commission necessarily need not be trained or learned in the law. As so often happens in an administrative proceeding, the Commission and its employes are the investigators, the prosecutors, the judges and jury. On balance, this results in an unduly heavy force on the side of the proponents of *damages*. Traditionally, damages, in this Commonwealth, have been a matter for courts of law, under an adversary system of justice, and therefore unless the Legislature clearly authorizes the Commission to award damages, we cannot extend to it such authority by judicial fiat, nor can we broaden the scope of the Commission's authority into a full scale lawsuit." (Emphasis in original.)

And in *Iron Workers Local No. 67 v. Hart*, 191 N.W.2d 758, 767 (Iowa 1971), the court said:

"The right granted Commission to allow back pay for employees ordered hired, reinstated or upgraded is only incidental to affirmative action equitably decreed and cannot by analogy generate a power to enter judgment for other common law damages. If the legislature had intended to constitute Commission as an additional court for adjudicating damages it would have so stated."

These cases indicate that even when the legislature is fairly explicit about the meaning of "affirmative action," a monetary damage remedy is not to be lightly implied. Those cases that have implied the existence of such a damage remedy have involved statutory language plainly indicative of a legislative intent to authorize monetary awards. No court, however, without more statutory direction, has construed the bare words, "affirmative action as will effectuate the purposes" of the statute, as set forth in § 14 (e), to authorize a monetary award.

In *Mendota Apartments v. D. C. Commission on Human Rights*, 315 A. 2d 832, 836 (D.C. 1974), the District of Columbia Court of Appeals, viewing language identical to that contained in § 14 (e) held:

"If the Commissioners had intended to give the Commission the extraordinary and unusual power to award damages, surely they would have said so in express words, specifying the basis on which damages could be awarded and some limitation on the amount that could be allowed. In our opinion the authority to order a respondent to 'take such affirmative action as will effectuate the purposes of this Article' did not include the authority to award civil damages. . . ." [8]

---

8. The District of Columbia statute now in force specifically authorizes the Commission to award compensatory damages.

*See also Murphy v. Industrial Commission,* 37 Wis. 2d 704, 157 N.W.2d 568 (1968), where the Supreme Court of Wisconsin held that the State Fair Employment Practices Act did not authorize a back pay award.[9]

We do not think that the General Assembly of Maryland, in enacting § 14 (e), intended that the Commission be empowered to make any monetary awards for compensatory or other damages.[10] In so concluding, we note that throughout its 47-year history, the Commission has seen its powers ebb and flow almost as many times as its name has been changed. In 1927, the Interracial Commission was created "to consider questions concerning the welfare of colored people residing in the State of Maryland, recommend legislation and sponsor movements looking to the welfare of said people, and to the improvement of interracial relations, and to cooperate with other State agencies to these ends." See Chapter 559 of the Acts of 1927. The Commission was also empowered to make by-laws and regulations and was vested with "full and plenary powers to investigate interracial conditions and to promote the welfare of the colored race and the betterment of interracial relations." In 1943, the Interracial Commission became the "Commission to Study Problems Affecting the Colored Population," and was at the same time divested of its specific power to investigate interracial conditions, recommend legislation, make regulations and "sponsor movements." See Chapter 431 of the Acts of 1943. The Commission was authorized by that act only "to make such surveys and studies concerning colored problems and interracial conditions as it may determine and shall have full power and authority to promote, in every way possible, the welfare of the colored

---

**9.** The Wisconsin statute provides:

"If, after hearing, the commission finds that the respondent has engaged in discrimination, the commission shall make written findings and recommend such action by the respondent as will effectuate the purpose of this subchapter. . . ."

**10.** No question is raised in this case concerning the constitutionality of authorizing an administrative agency to make monetary awards. *See* County Council v. Investors Funding, 270 Md. 403, 312 A. 2d 225 (1973).

race and the betterment of interracial relations." In 1951, this body became the "Commission on Interracial Problems and Relations" and reacquired the power to recommend legislation. See Chapter 548 of the Acts of 1951. But once again its powers were seemingly curbed as its authority "to promote the welfare of the colored race and the betterment of interracial relations" was specifically tied to its study and survey functions. In 1960, this restriction was dropped, but at the same time the clause was confined to promoting the betterment of interracial relations. See Chapter 100 of the Acts of 1960. It was not until 1963 that the Commission was given enforcement powers — coincidental with the state ban on racial discrimination in places of public accommodation. Chapters 227 and 228 of the Acts of 1963. Although the Commission's jurisdiction was later extended to cases involving discrimination in employment (Chapter 717 of the Acts of 1965) and discrimination in housing (Chapter 324 of the Acts of 1971) and its general powers were augmented to a degree in 1968 [11] and 1969,[12] its enforcement provisions have remained generally unchanged.[13]

In view of the Commission's legislative background, the failure of § 14 (e) to specifically authorize an award of compensatory damages, the unlikelihood of a legislative grant of unbridled power to an administrative agency to make monetary awards without guidelines or limitations, and the cited cases, we conclude that the Commission's order

---

11. In 1968, the Commission on Interracial Problems and Relations became the Human Relations Commission, Chapter 83 of the Acts of 1968, and acquired the power, reminiscent of the 1927 law, to hold an investigatory hearing whenever any problem of racial discrimination arose. Chapter 464 of the Acts of 1968. The original version of this bill gave the Commission itself the power to petition an equity court to secure compliance with its recommendations, but this provision was eliminated from the final enactment.

12. In 1969, the Commission, rather than the State's Attorney, was given the authority to seek court enforcement of its orders. Chapter 153 of the Acts of 1969.

13. Chapter 408 of the Acts of 1972 modified the Commission's hearing procedures. Provisions in the bill originally which would have empowered. the Commission to make regulations and to a degree insulated its orders from judicial review were stricken from the final enactment. Chapter 408 of the Acts of 1972.

granting Gutwein six weeks' loss of pay and moving expenses was plainly beyond its power and jurisdiction.

> *Order of the Circuit Court for Talbot County reversing the order of the Commission on Human Relations reversed; that part of the Commission's order awarding money damages vacated; each party to pay own costs.*