# STATE OF MARYLAND COMMISSION ON HUMAN RELATIONS ET AL. *v.* MALAKOFF ET AL.

[No. 37, September Term, 1974.]

*Decided December 3, 1974.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Philip J. Tierney, General Counsel* and *Elizabeth Holst Tockman, Assistant General Counsel,* with whom was *Jacob J. Edelman* on the brief, for appellants.

*Gary R. Alexander,* with whom were *Giordano, Alexander, Haas, Mahoney & Bush* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court.

On December 13, 1971, a black male, Luther Lord, one of the appellants here, filed a complaint, ultimately considered by Maryland's Commission on Human Relations,[1] the other appellant, which charged that

> "In November, 1971, I sub-leased the house at 2709 Babbitt Lane. The owner, Mr. Benedetti, after learning that I had moved into the house, informed me that Mr. Neitzey, the previous tenant, had no authority to rent to me, and that I had to move. It is my belief that Mr. Benedetti's desire to have me move is based on racial considerations because: 1. He is looking for a tenant; 2. I am already living in the house and 3. He wants me to move without giving me an opportunity to rent the premises directly from him.[2]
>
> "Additionally, I am charging Collington Realty Co. and Mr. Larry Malakoff, a Broker, with racial discrimination in the rental of the above house for the following reasons: 1. Mr. Malakoff was aware of my desire to rent the property; 2. Mr. Malakoff was attempting to rent the property for Mr. Benedetti and 3. Mr. Malakoff, knowing that I was already occupying the house, did not consider me for rental of the property."

---

1. Lord's complaint was originally filed with the United States Department of Housing and Urban Development under the Federal Fair Housing Law, but was referred by HUD to the Commission as authorized by 42 U.S.C. § 3610 *et seq.* (1970).

2. The complaint against Benedetti was conciliated pursuant to the Maryland Code (1957, 1972 Repl. Vol.) Art. 49B, § 13 (b) and (c) and therefore is no longer an issue.

A tribunal composed of five Commission members, after a full hearing, found that appellees Larry Malakoff and his company, Collington Realty, Inc., engaged in illegal racial discrimination in violation of Maryland Code (1957, 1972 Repl. Vol.) Art. 49B, § 22 (1), (2) and (4) and submitted to the Commission its recommendation for the disposition of Lord's complaint. Those portions of the section read:

> "It shall be an unlawful discriminatory housing practice, because of race, color, religion or national origin, for any person having the right to sell, rent, lease, control, construct, or manage any dwelling constructed or to be constructed, *or any agent or employee of such person:*
>
> "(1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling.
>
> "(2) To discriminate against any person in the terms, condition, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith.
>
> <div align="center">* * *</div>
>
> "(4) To represent to any person, for reasons of discrimination, that any dwelling is not available for inspection, sale or rental when such dwelling is in fact so available.
>
> <div align="center">* * *"</div>    (emphasis added).

The Commission, on July 20, 1972, adopted the hearing tribunal's "Decision and Recommendations," which contained an order stating in pertinent part:

> "1. Respondent Malakoff and Respondent Collington Realty, Inc., each is ordered to cease and desist from any activity violative of the Maryland Fair Housing Law.
>
> <div align="center">* * *</div>

"5. General Counsel for the Commission is directed to forward a copy of this Decision and Recommended Order to the Real Estate Commission." [3]

The appellees sought redress from this adverse decision by appealing to the Circuit Court for Prince George's County. There Chief Judge Ralph W. Powers concluded that since "the record is devoid of any evidence that Malakoff had any authority to lease the property" the real estate broker's failure to consider Lord as a tenant could not constitute illegal racial discrimination, and, accordingly, he reversed the Commission's order. This rebuff prompted Lord, together with his ally in the circuit court, the Commission on Human Relations, to appeal to this Court. However, since we agree with the result reached by the circuit court, we will affirm its judgment.

As the Commission's factual determinations play such a critical role in our review of this administrative agency's decision, we set them out in full:

"Respondent is a real estate broker. He has been licensed as such for just over four years; previously, he had been a real estate salesman for several years.

"Respondent operates mainly in the Bowie area, especially the Belair section of Bowie, where he has lived for over ten years. This is a largely white

---

**3.** In conjunction with the two parts quoted above, the Commission's order had three additional provisions. Number two requires respondents to state in newspaper advertisements that they endorse and will abide by Maryland's fair housing law. Number four compels respondents to practice and exhibit nondiscrimination in their solicitation of clients, advertising and hiring. These two parts are void since adequate notice of the factual bases from which they stem are not contained in the complaint. Ferguson v. United Parcel Serv., 270 Md. 202, 311 A. 2d 220 (1973), *cert. denied*, 415 U. S. 1000 (1974). Number three requires the payment of $1500 compensatory damages to the complainant for "humiliation." This is likewise void since we recently held that such an award was beyond the power of the Commission to mandate. Gutwein v. Easton Publishing Co., 272 Md. 563, 325 A. 2d 740 (1974). Hence, we need not further consider parts two, three and four since appellants concede they are improper under these two recent decisions.

residential area which has experienced a substantial growth since 1962, when Levitt & Co. began developing it. Until 1968, when the Federal Fair Housing Law was enacted, Levitt operated under a deliberately racially discriminatory policy.

"Respondent's business has grown steadily over the years. In 1971 he sold 69 houses, managed 8-10, and rented perhaps 22. This produced an income of some $60,000.00. However, he apparently rented to only one black in 1971, and sold to none. He has had a few other transactions with black customers, and in 1968 rented a property he owned in Takoma Park, Montgomery County, to a black Army officer. Takoma Park is a relatively integrated area.

"In mid-July, 1971, Respondent first met Mr. Dante Benedetti, owner of the premises at 2709 Babbitt Lane, Bowie (Belair). Mr. Benedetti, like Respondent, is white.

"On August 2, 1971, Mr. Benedetti employed Respondent to find a tenant for the Babbitt Lane property, at a rental of $250 per month (Respondent's Exhibit 1). According to his usual practice, Respondent advertised this rental in the Washington Post. He said that 20% of his tenant placement came from these ads, 70% from tenant referrals, and 10% from walk-ins.

"On September 4, 1971, Mr. and Mrs. Maurice J. Neitzey, a white couple, walked into Respondent's office. A salesman showed them the Babbitt Lane property. A combination lease and 'Tenant's Personal and Credit Information' form was filled out and signed by the Neitzeys (Respondent's Exhibit No. 3). The lease portion called for rental of the property for 12 months from September 1, 1971, at $250 per month.

"Respondent verified the fact of Mr. Neitzey's employment, and noted (without verifying) that his

salary was $12,000-$13,000 per year, and his wife's $9,000. Although the couple gave him post-dated checks for the security deposit and first month's rental, Respondent presented the lease to Mr. Benedetti, who also signed it. The Neitzeys took possession of the property.

"On November 25, 1971, Mr. Benedetti came to Respondent's office at the Hilltop Shopping Center in a state of some annoyance. Benedetti told Respondent that Neitzey wanted to break the lease. Later, Neitzey told Respondent that Benedetti wouldn't let him break the lease, so he intended to sublet the property himself. Neitzey was not deterred when he was shown the clause in the lease prohibiting subletting without prior written consent of the owner.

"On November 28, in the early afternoon, Mrs. Neitzey called Respondent and said she had a black couple interested in renting the house. Respondent says he told her he was no longer the agent and had no authority to rent the property. He considered his authority terminated by the execution of the Neitzey lease on September 4.

"Later the same day, Mr. Neitzey called Respondent. Complainant, who was with Neitzey when the call was made, received the impression that Respondent had made an appointment to meet Neitzey and Complainant to discuss leasing the Babbitt Lane property. Respondent says he told Neitzey he had no authority to write a lease, and asked him not to come to his office.

"In any event, Neitzey, Complainant, and Complainant's wife drove to Respondent's office — a five minute trip from Babbitt Lane. When they arrived, the office was closed.

"The next day, Benedetti informed Respondent that the Neitzeys had abandoned the Babbitt Lane property, and left it dirty. He was extremely angry.

That same day, one Captain Deward, a white Army officer called Respondent, in search of a rental home like the Babbitt Lane property. Respondent had no rental listings on that date, but Captain Deward's name was placed on a waiting list.

"On December 1, Benedetti and Respondent signed a rental listing and management agreement for the Babbitt Lane house. Respondent immediately called Captain Deward and told him the house was available. He did not call Complainant; indeed, he could not, because he had never taken Complainant's name, and thus never placed it on a waiting list. As it turned out, Captain Deward looked at the house, but did not like it, so did not offer to rent.

"On December 2, Respondent advertised the Babbitt Lane property in the Washington Post as available for rent. The next day, however, he was advised by Mrs. Benedetti that Neitzey had paid the December rent. Respondent thereafter instructed his salesman, Denny, to show the property but not to sign a lease with anyone. Denny in fact showed the property to a white, Mr. Kibling.

"Saturday, December 4, 1971, was a fateful day for Complainant Lord, his wife and children. That evening, they moved into the Babbitt Lane property. Their peaceful and quiet (although technically illegal) possession of the premises was short-lived, however, for on the morning of December 5, Mr. Benedetti appeared and after a period of mutual introduction, ordered Complainant and his family to leave the premises. Benedetti then resorted to Respondent's office, and both returned to Babbitt Lane.

"Precisely what happened after that is a matter of considerable dispute. Complainant says he was told in the presence of his wife he could not lease the property, had no right to be there, and would have to leave. No reason was given, except that

Benedetti didn't want the property leased. He was never asked about his employment or income, although Respondent said he (Complainant) didn't make enough money to rent the house.

"Respondent's version is that Benedetti said Complainant and his family had to leave, because Neitzey had no right to lease to them. Respondent also claims he ascertained at this time that Complainant earned only $8,000 per year, and that this was insufficient to 'qualify' him as a tenant at Babbitt Lane. Several days later, there was a discussion between Respondent and Complainant at which it was ascertained that the joint income of Complainant and his wife was about $13,000.00.

"Respondent's version of the testimony is supported by Respondent and his part-time salesman, Denny. Complainant's version is supported by himself, and by Respondent's testimony at a hearing, in January, 1972, before the Circuit Court for Prince George's County. Benedetti is equivocal on this point.

"We believe Complainant, and find that on December 5, there was no detailed questioning about his income, and certainly no discussion of joint incomes until at least December 7, or perhaps later. We see no reason why Respondent would have falsified this point when testifying under oath before the Circuit Court. Certainly, his recollection then (about a month after the occurrence) should have been clearer than it was in June, 1972, about 6 months later.

"In any event, Respondent and Benedetti, after reiterating that Complainant had to leave, left the house. The preponderance of the testimony shows that Benedetti then told Respondent not to sign a lease with Complainant; but he also told Respondent that if Complainant would move out, apply, and qualify through normal channels, Benedetti might consider Complainant as a tenant.

"From this point on, the facts are in even more substantial dispute. Complainant says Respondent avoided meeting with him. Respondent denies this. They disagree about what facts relative to income were disclosed and at what times, although we find it clear that it was not until December 7 that the joint income of Complainant and his wife were disclosed, and we also find that it was on this date that Complainant first disclosed his own income to Respondent.

"Despite the factual disputes, some points are clear. We find that after December 5, 1971:

"1. Complainant discussed with Respondent the former's interest in renting or buying the Babbitt Lane property. Respondent's response was an effort to dissuade Complainant from doing so. Nor did Respondent make any attempt to locate Complainant elsewhere in the Bowie area.

"2. Respondent never communicated to Complainant Benedetti's statement to the effect that Benedetti might be willing to lease to Complainant if Complainant moved out and applied through normal procedures.

"3. Respondent never gave Complainant a Lease/Personal Information form, or in any other way assisted Complainant to apply through the normal procedures.

"4. Respondent made no effort to determine Complainant's total family income alone, plus statements by Benedetti about Complainant's 'crude' and shoddy furniture.

"5. Respondent put a white on his waiting list (Captain Deward) and showed the property to whites (Captain Deward and Kibling) while aware that blacks were interested in the property, but did not extend similar services to Complainant."

The Commission then concluded that "the following are

among the facts" which show that Malakoff, in violation of the fair housing statute, "refused to rent, or refused to negotiate for rental, discriminated in terms or conditions of rental, or represented to Complainant for reasons of discrimination that the property was not available for rent:

"1. Respondent rejected Complainant on economic grounds before he made any real effort to ascertain Complainant's economic status. This suggests that race, rather than financing, was the real reason for the rejection. Even if we accept Respondent's testimony that he questioned Complainant about his salary on December 5 (and we do not accept it) it is plain that Respondent did no more than elicit information as to Complainant's own income. In the case of a white couple (the Neitzeys) the income of both husband and wife was ascertained (Respondent's Exhibit 2).

"2. Despite the problem of Neitzey's breach of the lease, Respondent showed the property to two whites (Deward and Kibling). Kibling was shown the property after Respondent was aware that Complainant was occupying the property and was definitely anxious to rent it.

"3. Despite Benedetti's willingness to consider Complainant as a tenant if Complainant applied through normal channels, Respondent never communicated this information to Complainant, never gave him an application form to fill out, and thus never permitted him to apply through normal channels.

"4. Respondent was plainly reluctant and unwilling to deal with Complainant with respect to rental or purchase of any property in the predominantly white Belair section of Bowie.

"5. As of December 5, 1971, Respondent had never leased or sold any property in Bowie to a black. Its first consummated transaction with a

black in Bowie was on December 17, 1971. The complaint in the instant case was filed on December 13, 1971. Mr. Christopher, the black who was placed on December 17th, obtained a property in an 'integrated' section of Bowie (one developed after passage of the Federal Fair Housing Act of 1968). The Babbitt Lane property is in an 'unintegrated' part of Bowie (one developed before passage of that act, under Levitt's discriminatory policies)."

We preface our discussion of the issues presented for decision here by recognizing that when the courts of this State consider appeals from determinations made by administrative agencies they "are not permitted to substitute their judgment for the expertise of those persons who constitute the administrative agency from which the appeal is taken." *Grosman v. Real Estate Comm'n,* 267 Md. 259, 297 A. 2d 257 (1972). *See Bernstein v. Real Estate Comm.,* 221 Md. 221, 230, 156 A. 2d 657, 662 (1959), *appeal dismissed,* 363 U. S. 419, 80 S. Ct. 1257, 4 L.Ed.2d 1515 (1960). Consequently, courts may only inquire into and decide "(1) the legality of the . . . [agency's] actions, and (2) whether a reasoning mind reasonably could have determined that the factual conclusion reached was proven by the weight of the evidence on the record as a whole." *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 310, 236 A. 2d 282 (1967); *Gutwein v. Easton Publishing Co.,* 272 Md. 563, 325 A. 2d 740 (1974).

With this principle in mind, we meticulously scrutinized all of the evidence which was before the hearing tribunal. As a result of this close examination we conclude that the Commission made a substantial number of factual determinations which appear to be unsupported by the record. However, it is not necessary to detail these inconsistencies, as most do not pertain to the few issues which now remain to be decided. See footnote 3, *supra.*

In analyzing the factual findings of the Commission which are relevant to the issues now before us, we are required to

exclude from direct consideration all of the events occurring between September 4, 1971 (the date the Neitzeys signed the lease, thus ending Malakoff's initial agency for the Babbitt Lane property) and December 1, 1971 (the date he entered into a new agency relationship with Benedetti). This follows as a reading of the record clearly shows that Malakoff and his company were not re-employed as rental agents for the Babbitt Lane property until the December date and it is tautological that one cannot be guilty of racial discrimination within the meaning of § 22 of Art. 49B, quoted *supra*,[4] based on events which occurred at a time when he is neither a "person having the right to . . . lease . . . any dwelling . . . [nor] an agent . . . of such person . . . ." We do agree, however, that this evidence may be considered by the Commission but only if it is used to illuminate or aid in interpreting whether the post-December 1 activities of the appellees, as charged by Lord, violate the statute.

With the signing of the rental listing and management agreement on December 1, it is clear that Malakoff became answerable for any violations of section 22 engaged in by him while dealing with the property which was the subject of that agency contract. And, this is true whether he acted independently of his principal's knowledge or instructions, or he acted knowingly pursuant to, or in aid of, an illegal discriminatory purpose which was being pursued by his principal. *Ivy H. Smith Co. v. Warffemius*, 201 Md. 367, 373, 93 A. 2d 764 (1953); *Dunning v. Randall H. Hagner & Co.*, 63 A. 2d 770, 771-72 (D.C.Mun.Ct.App. 1949). Therefore, if Malakoff's activities are indeed discriminatory, he cannot be permitted to take refuge behind the skirts of Benedetti by contending that he was merely following the orders of his principal. These views are in accord with those expressed by the Supreme Court of Wisconsin in *Ford v. Wisconsin Real Estate Examining Board*, 48 Wis. 2d 91, 179 N.W.2d 786 (1970), a case with

---

4. Although specifically not considered by the Commission, Code (1957, 1971 Repl. Vol.) Art. 49B, § 11C, a related anti-discrimination statute, is broader in scope.

similar facts presenting an analogous issue but which reached a different result because of a significant fact not present here. In the words of that court: [5]

> "The essential and basic feature underlying the relation of a [real estate] broker to his employer is that of agency, and the principles of the law of agency apply throughout. Respondent [(the real estate company)] is correct in its contention that a broker must act in conformity with his authority and instructions and is responsible to his principal if he violates this duty, but clearly an agent is not liable for failure to obey instructions to perform acts which are illegal.

> "Respondent argues that . . . [this principle] is not applicable here since . . . [the agent's] conduct did not . . . [violate it]. This is predicated on the fact that he had no right to show or sell the property without the owner's consent which was admittedly withheld. In effect, . . . [the agent] says he could not be guilty of . . . [illegal conduct] for refusing to do something . . . he could not have done . . . even if he had wanted to. This argument would be completely valid if . . . [the agent] had taken the listing without any conditions or agreements and was prevented from showing the property to a Negro because . . . [the owner] refused to allow it. But the record here indicates that . . . [the agent] entered the agency agreement with an oral agreement that he would not show the property to Negroes. . . . [The agent] agreed to and ultimately did assist his principal in the commission of . . . [an illegal act]. . . .

> "Respondent argues that . . . [the agent] did not perform any independent or discretionary act

---

5. This tort case involves unlawful discrimination as prohibited by a federal statute, 42 U.S.C. § 1982.

For clarity where the opinion uses proper names, identifying titles have been substituted. Additionally, on a few occasions we have supplied more general nomenclature than that used in the opinion.

leading to its inability to show the property to . . . [the black prospective buyer]. But he was offered the listing on the condition that he agree not to show it to Negroes. He was free to accept or reject the offer. He was not ignorant of the implications of the agreement since he testified that such conditions were not written into his records on the advice of his attorney. At that point he independently and voluntarily agreed to assist the owner . . . [in the perpetration of an illegal act], if the situation arose, and ultimately did so when . . . [the black prospective buyer] requested to see the property." (all citations omitted). 179 N.W.2d at 792-93.

Having established the existence of, and the responsibilities which adhere to, the December 1 agency, we now scrutinize the factual allegations which the appellants assert before this Court to demonstrate that the appellees violated section 22 of the Maryland fair housing statute. Because of appellants' concessions, referred to above, only three remain and they are summarized by the appellants as follows:

"1. The Commission found that the realtor's rejection of Lord on economic grounds was in effect a subterfuge since the realtor made no real effort to ascertain Lord's economic status.

"2. The Commission found that the realtor showed the property to two white persons after the original Neitzey lease was breached.

"3. The Commission found that the realtor never communicated to Lord the owner's condition for his consideration as a tenant."

Being fully cognizant of the fact that "[d]iscrimination presents a peculiar difficulty of proof; . . . [o]ne might say it is easy to see but hard to show," *Commission on Human Rights and Opportun. v. Carbone*, 6 Conn. Cir. 179, 269 A. 2d 92, 94 (1970), we now take a close look at these three assertions.

### (1)

After analyzing the conflicting testimony, we find that there is substantial evidence to support the Commission's determination that Malakoff did not ask Lord about his income until sometime after December 5. Under the facts here, however, this is not a sufficient basis to extrapolate, as the Commission did, that because Malakoff failed to ask the Lords what their income was, his rejection of them as tenants could not have been for economic reasons, and therefore it must have been racially motivated. We reach this conclusion as it is clear that the scope of Malakoff's agency, after Benedetti became aware that the Lords were occupying his property, was limited by Benedetti's instruction to his agent that he not consider the Lords as tenants unless they vacated the premises and then applied through "normal channels." Benedetti restricted Malakoff's agency in this way, he says, because he thought that by accepting a new tenant he would waive his legal rights to proceed against the Neitzeys for breach of the rental contract. Therefore, since the Lords failed to leave the premises and then apply, it makes no difference that Malakoff did not make inquiries about their income, because he was prohibited by his principal's directive from presenting them as interested renters.

### (2)

The Commission noted that two white prospective tenants were shown the house by the appellees (one on December 1 and the other on December 4) and indicated that this was evidence of discrimination because Malakoff did not provide the same service to the Lords. However, prior to December 5, Malakoff's only knowledge of the Lords was tenuous and indirect (solely from the Neitzeys' November 28th telephone calls) and this does not, of itself, authorize the conclusion that Malakoff's later failure to contact the Lords was racially motivated. Additionally, from December 5, when Malakoff met the Lords for the first time, to December 13, when the complaint was filed, the Lords were occupying the

premises and thus Malakoff can hardly be faulted for not showing them the very house in which they were then residing.

### (3)

Lastly, so as to justify the Commission's conclusion that Malakoff engaged in discriminatory practices, the appellants rely heavily on the factual finding that Malakoff failed to tell the Lords about Benedetti's willingness to consider them as tenants if they moved out and then applied through "normal channels." Assuming this to be true, it is questionable that this alone could be the foundation upon which to establish a violation of Maryland's fair housing statute. However, it is unnecessary that we decide this question because the Commission failed to factually determine the truth or falsity of the uncontradicted testimony of both Malakoff and Benedetti to the effect that Lord was informed of this offer by Benedetti himself, and this at a time when Malakoff was present. Thus, even though the Commission did determine that Malakoff failed to tell Lord of the Benedetti offer, it neglected to answer the complementary questions, which, under the circumstances here, become vital — i.e., whether Lord was made aware of Benedetti's offer and, if so, whether this fact was known to Malakoff. An answer in the affirmative to both of these questions is required, in this case, in order to justify the imposition of sanctions based, alone or together with other determinations, on Malakoff's failure to communicate Benedetti's offer to the Lords. This is so, because it surely would be anomalous to penalize Malakoff for not parroting something to the Lords about which he knew they were fully aware. In view of this observation it is appropriate to point out, as we have in previous opinions, not only the importance but the necessity that administrative agencies resolve all significant conflicts in the evidence and then chronicle, in the record, full, complete and detailed findings of fact and conclusions of law. Indeed, this is mandated by Code (1957, 1971 Repl. Vol.) Art. 41, § 254.

As the record in this case does not disclose a legal basis for the imposition of the sanctions directed by the Commission, the order of the Circuit Court for Prince George's County will be affirmed.

> *Order of the Circuit Court for Prince George's County, reversing the orders of Maryland's Commission on Human Relations, affirmed.*
>
> *Costs to be paid by appellants.*