# DANIEL KATZ et ux. *v.* INSURANCE COMMISSIONER OF MARYLAND et al.

[No. 475, September Term, 1982.]

*Decided January 6, 1983.*

The cause was argued before MOYLAN, LOWE and LISS, JJ.

*Ron M. Landsman,* with whom were *David R. Straus, Spiegel & McDiarmid* and *M. Michael Klein* on the brief, for appellants.

*Michael L. Cohen* and *Dennis Sweeney, Assistant Attorneys General,* with whom was *Stephen H. Sachs, Attorney General of Maryland,* on the brief for appellee, Insurance Commissioner.

*Douglas D. Connah, Jr.,* with whom were *Venable, Baetjer & Howard,* on the brief for appellee, State Farm Mutual Automobile Insurance Company.

LISS, J., delivered the opinion of the Court.

This is an appeal pursuant to the Maryland Insurance Code (1957, 1979 Repl. Vol.) Art. 48A, § 242B (2) of an order of the Baltimore City Court affirming an order issued by the Insurance Commissioner of Maryland dated October 5, 1981. The Insurance Commissioner rejected a challenge to the Insurance Division's prior approval of a statewide increase in premium rates for private passenger automobile insurance underwritten by one of the appellees herein, State Farm Mutual Automobile Insurance Company. The appellants, Daniel and Judy Katz, are two State Farm policyholders who reside in Maryland and who brought this action against State Farm and the Insurance Commissioner of Maryland.

On November 3, 1980, State Farm sent the Commissioner, as required by Maryland Code (1957, 1979 Repl. Vol.) Art. 48 A, § 242 (d), a "rate filing" that proposed a 9.8 per cent increase in private passenger automobile insurance rates, to become effective February 15, 1981. After a hearing on December 17, 1980, at which State Farm presented additional data, the Commissioner approved the filing; the increase took effect February 10, 1981 for new business and March 10, 1981 for renewal business.

On June 2, 1981, the appellants applied through counsel to the Commissioner for a second hearing pursuant to Art.

48A, § 242 (f) (4), which permits any person or organization purporting to be aggrieved with respect to any rate filing to ask for a hearing and specify the grounds of grievance sought to be established. The Commissioner ordered a second hearing, which was held July 14, 1981 before two hearing officers, the Assistant Commissioner and the Acting Chief of the Forms and Rating Section of the Insurance Commissioner's office. At the hearing, counsel for both sides presented oral expert testimony and additional documentary evidence, although the appellants themselves did not appear. On October 5, 1981, the Commissioner issued an order in which the arguments of appellants were rejected and the rate approval granted State Farm was upheld.

The appellants timely noted an appeal to the Baltimore City Court pursuant to Art. 48A, § 242B (2). After briefing and oral argument, that Court issued a memorandum opinion and order on February 26, 1982, finding "that there were material facts to support" the Commissioner's order and that the order "was not arbitrary or contrary to the law." Accordingly, the court affirmed the Commissioner's order, and the instant appeal followed. Two issues are presented for determination by this Court:

> 1. Whether State Farm's rate filing gave due consideration to underwriting profits, contingencies and investment income, as required by Maryland Code (1957, 1979 Repl. Vol.) Art. 48A, § 242 (c)?
>
> 2. Whether the Assistant Insurance Commissioner's reliance on an extra-record document violated appellant's due process rights under Maryland law and the U.S. Constitution?

## I.

Maryland has been a leader among the States which require that auto insurance rates be established by taking into full consideration the earnings that the insurance companies generate from the investment of their policyholders' funds.[1]

---

1. Then Commissioner Newton Steers, in 1966 first interpreted the old

In its filing and at the first hearing, State Farm calculated the amount of increase it would need by estimating the claims experience and expense it anticipated would occur during the year commencing six months before November 1, 1981 and six months after that date by suggesting the amount of return it would need to earn to maintain a sound financial position. As explained by State Farm's expert actuarial witness, the procedure involved the following steps:

(a) Past and current claims cost data for each line of coverage are analyzed so that the average cost of policy claims can be projected for the period for which the rate increase is sought. Then, past and current claims frequency data (i.e., the number of claims made per 1,000 cars insured) for each coverage are analyzed so that the average frequency of claims can be projected for the applicable period. Then, the projected cost and frequency of claims are combined to produce total projected claims of losses for the period.

(b) Next, a projection is made of anticipated underwriting expenses for the period the rate will be in effect, again, using past and current expense experience as a guide.

(c) Finally, the insurer's total financial need for the period is estimated and applied against the above anticipated losses and expenses. This involves estimating the amount of underwriting profit and contingency needed, considering the level of growth the company wishes to maintain, the likely effect of inflation, and the investment income the company may earn.

---

rate-making statute to require that policyholders get credit in rate-making for the earnings from their payments. Maryland Bureau of Casualty Underwriters (Md. Ins. Dept., Jan. 7, 1966), quoted and discussed in Birkinsha, "Investment Income and Underwriting Profit: And Never the Twain Shall meet?" 8 *B.C. Ind. & Comm. L. Rev.* 713, 719 (1967). The statute removes any doubt and expands the protection by requiring consideration of income from the major reserves and of "all other relevant factors . . . ." Art. 48A, § 242 (c) (1) (vi) and (viii). More than half the states have followed suit.

In its rate filing State Farm discussed its financial needs, *i.e.,* the "income" side of the ratemaking equation and reported, among other things, its investment profits and losses for each year from 1968 through 1979 and expressed 6.1 per cent of earned premiums as a mean of those years. It then pointed out that during those years, the average of 6.1 per cent return on investments, combined with an average underwriting return of 2.9 per cent resulted in a total after-tax return of 7.0 per cent of earned premiums, or 11 per cent to 16 per cent of net worth. This return, State Farm explained, "produced satisfactory results during periods of inflation in the 5% to 10% range." The exhibit went on to point out that the prevailing inflation rate was at the time in excess of 10 per cent; [2] and thus, State Farm's actuary later testified, "We should be looking at an 18 per cent return" and an "18 per cent return" [*i.e.,* on net worth] is what "we ought to be talking about nowadays." [3]

Insurance ratemaking is not only "a highly complex procedure accomplished by experts in the field," *Maryland Fire Underwriters Rating Bureau v. Insurance Commissioner of Maryland,* 260 Md. 258, 266, 272 A.2d 24 (1971), but also is "a judgmental field" in which rates "cannot be determined with exactitude," *Insurance Services Office v. Whaland,* 378 A.2d 743, 746 (N.H. 1977).

The ratemaking principles and standards for judicial review adopted by the General Assembly are set forth in the Insurance Code. Art. 48A, § 242 (c) provides in pertinent part:

> (c) *Making of rates.* — All rates shall be made in accordance with the following principles:

> (1) Due consideration shall be given to (i) past and prospective loss experience within and outside this State; (ii) conflagration and catastrophe hazards, if any; (iii) past and prospective expenses both countrywide and those specifically applicable

---

**2.** This fact was not disputed by the appellants. In fact, their expert conceded at the hearing an inflation rate of 13.8 per cent.

**3.** Appellants did not contest the reasonableness of this position.

to this State; (iv) underwriting profits; (v) contingencies; (vi) investment income from unearned premium reserve and reserve for losses; (vii) dividends, savings or unabsorbed premium deposits allowed or returned by insurers to their policyholders; (viii) and to all other relevant factors within and outside this State.

(2) Rates shall not be excessive, inadequate, or unfairly discriminatory.

The standard for judicial review is found in § 242B, which states in pertinent part as follows:

If the Baltimore City Court finds that the Commissioner's order or decision is not supported by the preponderance of the evidence on consideration of the record as a whole, or is not in accordance with law, the court shall reverse or modify the Commissioner's order or decision in whole or in part.

An appeal to the Court of Special Appeals may be taken from the decision of the Baltimore City Court as in other civil cases. The Commissioner shall be made a party to every appeal of this nature.

In *Maryland Fire Underwriters Rating Bureau v. Insurance Commissioner of Maryland, supra,* the Court of Appeals noted that "it would be well to delineate the narrow scope of judicial review of legislative functions of the [Insurance] Commissioner arising under the rating subtitle of the Act [§ 242B]." [260 Md. at 263-264]. The high court further cautioned that a reviewing court "should be loath to substitute its judgment for the result reached by an administrative agency. . . ." [*Id.* at 266], and followed its prior decision in *State Insurance Commissioner v. National Bureau of Casualty Underwriters,* 248 Md. 292, 236 A.2d 282 (1967), characterizing Chief Judge Hammond's opinion in that case as having "carefully considered the scope of judicial review permitted by § 245 [now § 242B (2)]." [*Id.* at 265]. In *State Insurance Commissioner v. National Bureau of Casualty Underwriters, supra,* the Court of Appeals had construed the statute as follows:

* * * We read the direction to the court to determine whether or not the Commissioner's order is supported by a preponderance of the evidence to mean that the court must rule whether or not the Commissioner followed the legislative directive to reach a factual conclusion in the matter before him on the basis of a preponderance of the evidence, not to make its own independent decision whether it would have valued the evidence in the same way and reached the same result. The statutory standard imposed on the court is not to decide whether the Commissioner was right in his factual determinations and inferences but whether those determinations could reasonably have been made by a reasoning mind using the preponderance of the evidence test. The reviewing court must decide only whether the Commissioner could reasonably have decided that a preponderance of the whole evidence supported his conclusions of fact, not whether those conclusions were correct. The permission given the court to modify the administrative order or decision refers, we think, to correction of orders or decisions "not in accordance with law" and was not intended to permit a modification on the facts. [248 Md. at 305].

and concluded:

We hold that a court in reviewing legislative actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, without exercising nonjudicial functions, provided it does not itself make independent findings of fact or substitute its judgment for that of the agency. Section 245 of Art. 48A, properly construed, does no more than permissibly require the court to decide (1) the legality of the Insurance Commissioner's actions, and (2) whether a reasoning mind reasonably could have determined that the factual conclusion reached was

proven by the weight of the evidence on the record as a whole. [248 Md. at 310].

*See also State of Maryland Commission on Human Relations v. Malakoff,* 273 Md. 214, 329 A.2d 8 (1974); *Serio v. Mayor and City Council of Baltimore,* 208 Md. 545, 119 A.2d 387 (1956).

In order to set aside an order of the Insurance Commissioner, it must be shown that the Commissioner's decision was unsupported by substantial evidence on the record considered as a whole. *Brotherhood of Railroad Trainmen v. Baltimore & Ohio Railroad Co.,* 248 Md. 580, 238 A.2d 516 (1968).

Essentially, the appellants argued before the administrative agency, on appeal to the Circuit Court and to us that the hearing officer should have accepted the projections, opinions and methods of calculation espoused by Robert Hunter, President of the National Insurance Consumer Organization (NICO) rather than those of the expert produced by State Farm.

The appellants did not challenge the statistical data upon which State Farm relied. To the contrary, they accepted the validity of the statistics used by State Farm but made projections from these figures which were substantially different from those of the Company. In effect, they urged the trial court below and this Court to substitute their judgment for the expertise of the Insurance Commissioner. This we are not permitted to do by the clear mandate of § 242B (2). From our careful consideration of the extensive record in this case we conclude that the Commissioner could reasonably have decided that a preponderance of the entire evidence supported his conclusions of fact and that therefore no reversible error occurred.

## II.

The request for a second hearing filed by the appellants was primarily based upon an affidavit of Robert Hunter, which attacked State Farm's filing on two separate grounds. Initially, he claimed that State Farm's projection of the

frequency of accident claims was too high.[4] Secondly, Mr. Hunter contended that State Farm should not have been allowed a rate increase that would include any provision for underwriting profits or contingencies but instead should be required to reduce its rates by 6.4 per cent and as a result incur underwriting losses. This recommended action was based on his opinion that State Farm had underestimated the amount of income it would probably earn from its investments. At the second hearing, Mr. Hunter introduced a booklet that he had written as president of the consumer advocacy group founded by him in 1980. The booklet, entitled *Taking The Bite Out Of Insurance-Investment Income And Rate Making,* contends that insurance ratemaking should more fully reflect insurance companies' investment income.

The publication did not consider in any manner whatsoever the State Farm rate filing involved in this case and it mentioned Maryland only in passing (acknowledging that it is one of seventeen states whose laws require the consideration of investment income in ratemaking). The NICO booklet discussed industrywide principles and practice on a national basis and advocates widespread adoption of a ratemaking model, known as the Capital Asset Pricing Model, which is currently used in Massachusetts. It is significant that Mr. Hunter conceded that he had "essentially accepted" State Farm's ratemaking approach "for the purpose of this hearing." He acknowledged on cross-examination that there had been "50 years of debate on the investment income question." When the cross-examination of Hunter sought to elicit what the booklet had to do with the State Farm filing he stated, *"[W]hen we were talking about Exhibit 5 [i.e., the booklet] that had nothing to do with this hearing. I was talking about rate regulations in other states. I don't see how it has anything to do with this hearing."* [Emphasis supplied].

The Assistant Insurance Commissioner, who heard the challenge filed by the appellants, noted in his order the fact

---

4. This claim has been abandoned on appeal.

that in reaching his conclusion he considered the booklet designated as Exhibit 5 on behalf of the protestants. He also stated that he had considered another pamphlet prepared by Mr. Hunter's organization entitled *Commissioner's Alert-Gas Prices And Auto Rates* (February 1981) which had also been presented at the hearing. The hearing officer stated that:

> Upon review of the transcript of record, the accompanying exhibits and the memoranda submitted by Katz and State Farm, and a review of *Automobile Insurance Rates and Investment Income,* Insurance Information Institute, N.Y., N.Y. (1981), which is part of the records of the Insurance Division, I conclude that the rate filing entitled "80 PA 366", approved on January 10, 1981 by the Insurance Commissioner was reasonable, not excessive, inadequate or unfairly discriminatory and was in compliance with Maryland Article 48A, Section 242 (d) (7) and I disallow the relief sought by the Katzes.

Appellants contend that the Assistant Commissioner erred in relying on an unsworn, extra-record document, without notice to the Katzes and without providing an opportunity to them to respond. *Automobile Insurance Rates and Investment Income* was a pamphlet produced by a "Joint Industry Task Force" consisting of State Farm, four other insurance companies and five industry trade groups. The executive summary and introduction state that the pamphlet was written to refute Mr. Hunter's study on investment income. It was published in June 1981, a month before the hearing but was not offered into evidence by State Farm nor did the Assistant Commissioner give notice that he would consider the pamphlet or rely upon it.

Appellants argue that the Assistant Commissioner's use of the extra-record pamphlet amounted to a violation of the requirement that administrative agencies must observe the basic rules of fairness as to parties appearing before them. *Maryland Fire Underwriters Rating Bureau v. Insurance*

*Commissioner of Maryland, supra; Dal Maso v. Board of County Commissioners for Prince George's County,* 238 Md. 333, 209 A.2d 62 (1965). Appellants also urge the hearing officer's conduct amounted to a violation of the due process clause of the Fourteenth Amendment. In support of this contention, appellants rely on *Ohio Bell Telephone Company v. Public Utilities Commission of Ohio,* 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093 (1937), and *United States v. Abilene and Southern Railway Company,* 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016 (1924).

The record extract reveals that there is no evidence that State Farm furnished the controversial pamphlet to the Insurance Division [5] and in the absence of proof to the contrary we accept the hearing officer's statement that the pamphlet was discovered among the records of the Insurance Division. We are unable to determine from the record before us exactly what significance, if any, should be attached to the consideration of the offending pamphlet by the hearing officer. We agree with appellee that neither Hunter's pamphlet nor the disputed one prepared by the insurance industry stated any evidentiary facts or Maryland law which in any manner were related to State Farm's calculation of its investment income. Instead, each represented a statement of position of divergent views on which there had been, according to Hunter, "50 years of debate." If, as suggested by Hunter on cross-examination, his pamphlet had nothing to do with the hearing, then the rebuttal to his position was equally irrelevant. Appellants made no effort to determine the extent of the hearing officer's review of the insurance industry's pamphlet and made no request for a further hearing at which an appropriate record might have been prepared. Even at this late date no proffer has ever been made as to what information in the latter pamphlet was prejudicial to the appellants' cause.

The several cases cited by appellants are legally correct but factually inapposite to the case at bar. In *Dal Maso, supra,* the report in question was a crucial one which

---

5. Nor do the appellants make this contention in their briefs.

specifically recommended denial of the zoning application in issue. In *Temmink v. Board of Zoning Appeals of Baltimore County,* 205 Md. 489, 109 A.2d 85 (1954), at issue were data which were heavily relied upon in reaching a decision. In *United States v. Abilene and Southern Railway Company, supra,* the disputed material consisted of facts from a party's annual reports which the court found it necessary to prove.

We conclude that the record fails to disclose any violation of procedural due process. *See Montgomery County v. National Capital Realty Corporation,* 267 Md. 364, 297 A.2d 675 (1972).

Approximately one week before this case was scheduled for oral argument before this Court, appellants filed with the Clerk of this Court a motion to remand in the light of newly disclosed evidence. They alleged that they had received a communication from the Attorney General's office that an Assistant Attorney General "became aware that *ex parte* communication *may* have taken place which --- were related to the State Farm Mutual rate revision hearing" and that "counsel for State Farm *may* have edited or otherwise participated in drafting the final order."

Appellants in their motion requested this Court to remand the case to the Baltimore City Court for further proceedings "to determine whether, and if so, to what extent *ex parte* communications infected this proceeding and violated the fair procedure and due process rights of Maryland policyholders." Appellants contended that if the allegations proved correct they would be entitled to "a new decision."

The Acting Insurance Commissioner, one of the appellees herein, by his assigned counsel, an Assistant Attorney General, filed an answer to the motion to remand in which he stated that the Insurance Commissioner did not oppose a remand to the Baltimore City Court provided the remand required the Baltimore City Court to remand the case to the Insurance Commissioner for further proceedings and the issuance by the Commissioner of a new decision.

The several memoranda filed in support and in opposition to the motion to remand disclose that the Insurance Commissioner, as a result of a preliminary investigation, found

that the allegations of *ex parte* communication were unsubstantiated and not correct but the Commission represented to this Court that the purposes of justice would be advanced by allowing further administrative proceedings to take place and to permit the issuance of a new decision by an impartial hearing officer selected by the Acting Insurance Commissioner.

State Farm objected to a remand on any of the grounds suggested by the appellants and to a remand to either the Baltimore City Court or the Insurance Commissioner. At oral argument on the merits of the case each of the parties to the case was afforded a hearing on the motion to remand before the hearing on the merits. The disposition of the motion to remand was reserved.

After due consideration of the memoranda filed by each of the parties in support of their positions we have concluded that it would be inappropriate to remand this case. We conclude that we do not have appellate jurisdiction at this time over the alleged *ex parte* communication with the office of the Insurance Commissioner. Our jurisdiction, as stated in *Shell Oil Co. v. Supervisors of Assessments of Prince George's County,* 276 Md. 36, 42, 343 A.2d 521 (1971), "does not arise until there is an initial exercise of judicial power or authority by a court. Appellate jurisdiction is the review of that initial exercise of judicial authority." [276 Md. at 42].

In *Eastgate Associates v. Apper,* 276 Md. 698, 350 A.2d 661 (1976), the Court of Appeals held that this Court could not invoke Rule 1071 (authorizing remand) to decide a substantive issue in a case that had come to it prematurely and over which it had no jurisdiction because no final judgment had been entered in the court below.

The Court of Appeals has permitted remand on this basis of some matters brought to the Court's attention from outside the record *after proper entry of a final judgment. Earl v. Anchor Pontiac Buick, Inc.,* 246 Md. 653, 229 A.2d 412 (1967); *Fletcher v. Havre de Grace Fireworks Company,* 229 Md. 196, 183 A.2d 386 (1962). In both of those cases demurrers without leave to amend had been granted below and the remands were simply to permit the filing of amended declarations.

Appellants have submitted to this Court a proposed order of remand to the Baltimore City Court in which they urge us to direct that court to instruct upon remand as follows:

[T]o the Baltimore City Court for further proceedings with respect to all procedural matters affecting the handling of this case before the Insurance Commissioner, including whether and to what extent there were ex parte communications between the Insurance Division and State Farm Mutual Automobile Insurance Co. relating to this matter.

The Baltimore City Court shall oversee all appropriate fact finding, shall render findings of fact and conclusions of law with respect to all matters bearing upon the procedural issues raised by Appellants, and shall issue appropriate orders.

Any such order to the Baltimore City Court would be grossly inappropriate. As we have already indicated, the standard of review by the Baltimore City Court is stated in Art. 48A, § 242B of the Maryland Code. The powers of the reviewing court are circumscribed by the Declaration of Rights of the Maryland Constitution which requires that judicial and legislative functions be kept separate and apart. The reviewing court may not make independent findings of fact and under the Insurance Code may not take evidence. *See State Insurance Commissioner v. National Bureau of Casualty Underwriters, supra.*

We are not persuaded that it would serve any reasonable or necessary purpose to remand this voluminous and long drawn out proceeding to the Insurance Commissioner for what would amount to a reopening of the proceedings *ab initio.* If there has been any improper action on the part of an employee of the Insurance Commissioner or any impropriety by any representative of State Farm there are several avenues available to the Insurance Commissioner to remedy these indiscretions. If the Insurance Commissioner as a result of his investigation concludes that the rates allowed were improperly approved, then under his broad powers to

oversee automobile insurance rates he may order a reduction and may, if he deems it appropriate, order a refund. *See* Insurance Code, Art. 48A, § 242 (c-1).

We decline to order the remand requested and have chosen to decide the case on its merits.

*Judgment affirmed.*
*Costs to be paid by appellants.*