884 A.2d 748

**MOMBEE TLC, INC.**

**v.**

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

**No. 1779, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 6, 2005.

Peter A. Prevas, Baltimore, for Appellant.

Sandra R. Gutman (Ralph S. Tyler, City Sol., on the brief), Baltimore, for Appellant.

Panel: DEBORAH S. EYLER, KRAUSER, LAWRENCE F. RODOWSKY (Retired, specially assigned), JJ.

KRAUSER, Judge.

To obtain a nonconforming use permit for the adult entertainment presented at its bar, the aptly named "Club Bunns," appellant Mombee TLC, Inc., filed a "use" application with Baltimore City's Department of Housing and Community Development. When the Office of the Zoning Administrator denied that application, appellant took the matter before the City's Board of Municipal and Zoning Appeals (the "Board"). There, appellant achieved what, under other circumstances, would have been a victory: Three of the five Board members voted to allow appellant to continue presenting adult entertainment[1]—two did not. Because a supermajority of the Board, that is, four out of its five members, must approve such an application, it was denied. Md.Code (1957, 2003 Repl. Vol.), Art. 66B § 2.08(i)(1).

Undeterred, appellant filed a petition for judicial review in the Circuit Court for Baltimore City. When that court affirmed the Board's decision, appellant noted this appeal, presenting us with this novel question:

> When a minority of the voting members of a board prevent a majority of that board's members from approving a nonconforming use, must the minority issue findings of fact and conclusions of law in support of its decision, as would have been required of the majority had it prevailed?

Because we conclude that a prevailing minority is required to issue findings of fact and conclusions of law so as to permit

---

[1]. The majority, however, imposed certain conditions on the Club's presentation of adult entertainment, specifically that it should be "restricted to one night a week and only in 608 W. Lexington Street."

judicial review of its decision and that did not occur here, we shall vacate the judgment of the circuit court and remand this case to that court with instructions that it, in turn, remand this matter to the Board so that the minority of Board members, who disapproved appellant's application for a nonconforming use, can issue findings of fact and conclusions of law, supporting its successful opposition to appellant's application.

### Background

Appellant's bar is located at 606–608 West Lexington Street,[2] a two-story brick building in Baltimore City. Originally owned by S.T.S., Inc., the bar is located in a B–4 zoning district, where, under § 6–506 of the Baltimore City Zoning Code (2004), a tavern with live entertainment and dancing is a permitted use, but an adult entertainment business is not. Although not permitted in a B–4 zone, it may, nonetheless, exist there as a nonconforming use, but only if it has done so continuously since September 10, 1993. Baltimore City Zoning Code § 13–609.[3] And that is precisely what appellant claims. It contends that it has been presenting "adult entertainment" since 1990 and therefore, contrary to what the Board held, is entitled to continue presenting such entertainment as a nonconforming use.

To fully understand the nature of the nonconforming use requested by appellant, we must briefly review the statutory definitions of the terms, which define that use, namely, "adult entertainment business," "adult entertainment," "nudity," and "partial nudity." "Adult entertainment business," under § 1–106(b) of the zoning code, "means any cabaret, lounge, night club, modeling studio, or other establishment whose major

---

**2.** 608 West Lexington Street is owned by Carl Scheffel, his son, Carl Scheffel, Jr., and Wilford Terry. 606 West Lexington Street is owned just by Carl Scheffel.

**3.** Section 13–609 of the Baltimore City Zoning Code provides: "Any adult-entertainment business existing on September 10, 1993, is considered a nonconforming use, subject to all Class III regulations."

business is offering its customers adult entertainment," which leads to the question: What is "adult entertainment"? "Adult entertainment means," among other things, "entertainment in which individuals appear for public view in a state of nudity or partial nudity ..." Baltimore City Zoning Code § 1–106(a)(2)(i).[4] And that, in turn, leads to the question: what is "nudity" and "partial nudity"?

"Nudity" means:

(i) the showing of the human male or female genitals, pubic area, or buttocks with less than a fully opaque covering;

(ii) the showing of the female breast with less than a fully opaque covering over any part below the top of the nipple; or

(iii) the depiction of covered male genitals in a discernibly turgid state.

Baltimore City Zoning Code § 106(a)(3).

"Partial nudity" means a state of dress in which opaque clothing covers no more than:

(i) the human male or female genitals, pubic area, or buttocks;

(ii) the female breasts below the top of the nipples; and

---

4. Under Baltimore City Zoning Code § 1–106(a)(2), " '[a]dult entertainment' means entertainment:

(i) in which individuals appear for public view in a state of nudity or public nudity;

(ii) that is intended to provide sexual stimulation or sexual gratification;

(iii) that is distinguished or characterized by an emphasis on material that depicts, describes, or relates to:

(A) human genitals in a discernable state of sexual stimulation or arousal; or

(B) acts of human masturbation, sexual intercourse, sodomy, or physical contact with an individual's clothed or unclothed genitals, pubic area, buttocks, or if the individual is female, breast; or

(iv) that, applying contemporary standards, the average individual would find, taken as a whole, appeals to the prurient interest."

(iii) portions of the body covered by supporting straps or devices.

Baltimore City Zoning Code 1–106(a)(4).

### Administrative Proceedings

On October 10, 2002, appellant filed an application with the Department of Housing and Community Development to change the existing use of its bar from a "tavern including live entertainment and dancing" to a "tavern including live entertainment and dancing, *and adult entertainment.*" (Emphasis added). Because "adult entertainment" is not a permitted use in the zoning district where the bar was located, appellant's request to present such entertainment was a request for approval of a nonconforming use. Such approval required evidence that the entertainment was "adult," as defined by Baltimore City Zoning Code § 1–106(a)(2) and (b)(4), and has been presented, without interruption, since September 10, 1993. *See* Baltimore City Zoning Code § 13–609.

When the Office of the Zoning Administrator denied its application, appellant appealed to the Board. At the ensuing Board hearing, appellant claimed that it, and the previous owner of the bar, S.T.S., Inc., had offered "adult entertainment" weekly since 1990 at the 608 West Lexington Street portion of the property and that they had the permission of the Board of Liquor License Commissioners for Baltimore City ("liquor board") to do so.

In support of that claim, appellant introduced a letter dated April 20, 1990, from the Executive Secretary of the liquor board, authorizing "live male or female revue type entertainment one night per week" at 608 West Lexington Street and two of the liquor board's index card records for the property. One index card stated that, on April 5, 1990, a hearing was held and approval was granted for "live entertainment consisting of male or female revue type entertainment one night a week" at 608 West Lexington Street. The other indicated a transfer of the liquor license, from 608 to 606–608 West Lexington Street, on November 25, 1991.

In addition to submitting those documents, appellant presented three witnesses: Renold Owens, the past manager and now, with his brother, the current owner of the bar; Carl Scheffel, whose company, S.T.S., Inc., previously owed the bar and is presently appellant's landlord; and Wayne Jeffries, a current employee of the bar, who has worked there for the past fifteen years. All three witnesses testified that the bar has offered either nudity or partial nudity since at least 1990.

Renold Owens testified that he and his brother, Dana Owens, own the bar, through their corporation, appellant Mombee TLC, Inc.; that they purchased the business from Carl Scheffel's corporation, S.T.S., Inc., in 1997; that before and after the purchase, he managed the business, first for S.T.S., Inc., and then for his own corporation, Mombee TLC, Inc.; and that the bar has continuously provided adult entertainment since 1990. "I provide male adult entertainment, male dancers, one night and one night we provide female dancers," Owens said. Describing the format of the entertainment and the dress of the performers, he stated:

> We actually have a show that we put up a stage that's 18 inches high off the floor, up against the wall. Our clients are usually 3 feet away from the stage and we had dancers to get up and do two numbers each and they usually have topless females, and the guys bottom as well. They wear, I don't know what you call them the bottom pieces that they wear ... G-string ... type of items, yeah. And they usually—as I said, they all do two numbers of two songs and that's basically what, what we have. When you have people actually tip them, they throw dollars onto the stage or whatever.

The dancers, Owens testified, were topless but always had coverings on the bottom portion of their bodies, a G-string or "bikini bottom of some kind." Asked whether the dancers ever were ever totally nude or bottomless, Owens stated that, although frowned upon, "[i]t's allowed."

The bar's presentation of adult entertainment began, according to Owens, in 1989, with the approval of the liquor

board. "Back in 1989, we were told," he testified, "that we needed to get permission from the Liquor Board in order to do that and we went forward to the Liquor Board ... [We] called and sent a letter asking for permission to come before the Board and they had a hearing and we went for the hearing and they gave us the approval." The liquor board's approval was conveyed to them in a letter dated April 20, 1990, stating:

As per your request, you are hereby granted permission to furnish your patrons with live male or female revue type entertainment one night per week.

\* \* \* \*

If permitting this live entertainment causes your place of business to be operated in an improper or disorderly manner, it may be necessary to withdraw this approval at a later date.

On cross-examination, counsel for the University of Maryland, one of three parties that opposed appellant's request for a nonconforming use, questioned Owens about his brother's testimony at an April 21, 2001 liquor board hearing.[5] At that hearing, his brother and co-owner of appellant, testified that the dancers "are not showing any body parts, absolutely no personal body parts are shown at our shows ... We know, this [liquor] board has told us, make certain that there is no nudity in any of your shows. We don't have it." Asked whether he disagreed with his brother's statement, Owens responded:

Owens: No, I don't disagree with that.

Counsel: So there's no nudity on—in 2001, August, 2001?

Owens: August 2001, I don't understand your question. What are you—I don't understand.

Counsel: Well, as we described, as we talked about earlier, in August 2001, you were before the Liquor Board for a

---

5. At the August 23, 2001, hearing, Donald Owens, as licensee, and appellant stood accused of two liquor board rule violations: failing to cooperate with the police and providing adult entertainment without a license. Although Donald Owens denied those allegations, the board found him and appellant guilty of both violations.

violation. That violation was a violation for having adult entertainment and Mr. [Donald] Owens has testified here that there is no nudity. So do you believe that there was no nudity occurring in August 2001 at Club Bunns?

Owens: I don't—I said that occasionally, if I'm not mistaken, earlier, that sometimes there is nudity. Sometimes—we prefer that they don't have the nudity . . .

\* \* \* \*

Counsel: Your brother indicated, he described generally . . . how the female revue is done and he says there is no nudity and you say you disagree with that, the female revue at Club Buns does involve nudity?

Owens: Again, I will reiterate, nudity is allowed. We don't prefer that they be completely nude.

Counsel for the University also questioned Owens about a statement made at the same liquor board hearing by his attorney, asserting that "they [the dancers] have been doing live entertainment, never adult entertainment . . . they never had adult entertainment in their business." Queried as to whether he had corrected or disagreed with his attorney, Owens replied: "I don't know that I corrected her. I don't know what the terms may have been used at that time . . ."

Asked by a Board member to explain the difference between his testimony and his brother's, Owens stated: "When you're saying nudity I'm thinking of the bottom of the personal parts when I say that." Appellant's counsel took that opportunity to remind the Board that, under the zoning code, "adult entertainment" included "partial nudity," and that partial nudity included bikinis.

The University's counsel then introduced copies of a permit application, signed by Owens, and filed by appellant on August 23, 2001, the same day as the liquor board hearing. That application sought to change the use of the properties from "tavern" to "tavern including live entertainment and dancing." On that application, immediately below the handwritten description stating: "Use First and Second Floor as a tavern with live entertainment and dancing," were the words, in

handwritten block letters, "NO ADULT ENTERTAIN-MEN[T]."

Although no explanation was offered at that time as to the reason for this discrepancy, later, at the hearing before the circuit court, appellant's counsel denied that appellant had ever disclaimed adult entertainment in their application, explaining: "If you look at the handwriting, it's not in the handwriting of the applicant. That 'no adult entertainment' was put there by the zoning officials. And the reason was, is that they knew at that point there had to be a hearing on the adult entertainment issue."

When asked whether that application should have indicated adult entertainment as an existing use of the property, Owens responded "no" and appellant's counsel explained that August 2001 permit application was an immediate and temporary solution and that his client intended to pursue a nonconforming use permit for adult entertainment before the Board:

The reason that you see this August 2001 use permit application is that there was a glitch in Zoning administration with regard to the consolidation of the buildings and therefore, what we immediately did was get the use permit, both buildings live entertainment, or tavern with live entertainment and dancing. We knew that we had to come for an appeal with regard to the nonconforming use for adult entertainment but we had—what we wanted to do was rectify immediately what could be rectified downstairs without an appeal. The intention was subsequent to that to pursue the nonconforming use appeal.

There was no waiver of any rights with regard to the filing of that. It was just made clear on the use application by Zoning administration, we're not going for the adult entertainment portion at this time, issued [sic] the use permit without it to get that part cleaned up now. Go for the adult entertainment nonconforming use later.

Also introduced was the permit for 606 West Lexington Street, issued three weeks after the August 2001 application, which stated "(USE) USE 1ST AND 2ND FLOOR AS A

TAVERN WITH LIVE ENTERTAINMENT [sic] AND DANCING NO ADULT ENTERTAINMENT."

Explaining the delay between the 2001 permit and the filing of the October 10, 2002 permit application requesting adult entertainment, Owens stated, "we were actually getting our finances in order, the legal advice and application to submit to Zoning as well."

The second witness presented by appellant was Carl Scheffel, the former owner of the bar and appellant's current landlord. He testified that, in 1990, when he owned the bar, he began to offer adult entertainment after obtaining verbal approval from the liquor board. Unable to identify who specifically gave that approval, he speculated, "I'd say Mr. Stansbury but I could be incorrect."

As to what "male or female revue" meant in 1990, Scheffel explained: "My words, risque dancing, you know, bikinis." In the early 1990's, he explained, the dancers wore "[r]isque clothing." Although he said that he didn't know if the women were topless, he insisted that the bar presented "semi-naked dancing" and "strip shows."

Appellant's third and final witness was Wayne Jeffries, an employee of the business for over 15 years. He stated that in 1990, "when it started, there was like a—each performance did two numbers. One number was a lip sync and the other number was the dancing ... The dress varied according to the song they were doing. Some was [sic] fully dressed, the guys in suits, sometimes casual wear sportswear, and the women sometimes in evening gowns or a robe or nightgown." During the performance, the dancers would shed some of their clothes, "down to bikini draw—bikinis and the top piece with the string." He recalled that "there was something hanging, would hang down, glued ... I think it was glued on there ... breasts," but "[b]ottoms was [sic] covered." Jeffries testified that the shows have continued to the present day, on a weekly basis, with a similar format and state of dress.

Opposing appellant's request for a nonconforming use permit were the University of Maryland at Baltimore, Westside

Renaissance, Inc., and Lexington Market. Each submitted a letter predicting that the presentation of adult entertainment would adversely affect current plans to revitalize the area; two of the three, the University and Westside Renaissance, presented testimony: Eugene Lockett, a self-described "Executive Analyst in Real Estate Development at the University of Maryland Baltimore," testified that the University owns the property adjacent to the "Club Bunns"; that the University intends to develop the property into residential housing for students; and that adult entertainment is "subversive to the whole area." R. Ron Kreitner of Westside Renaissance agreed. He stated that Westside plans to develop 2000 dwelling units in the area, that the residents they have attracted and those whom they hope to attract are concerned about having adult entertainment in the area and that "adult entertainment" was inconsistent with the community's development plans.

After the hearing ended, the Board "disapproved" appellant's application and issued a written decision, stating:

Three member [sic] of the Board found that the use of only 608 W. Lexington Street one night a week was legally established prior to September 10, 1993 and should be allowed to continue with the condition that the use be restricted to one night a week and only in 608 W. Lexington Street.

Two members of the Board voted to disapprove this appeal. They found that there was insufficient evidence to conclude that the non-conforming use was established and that the use complies with the definition of an adult entertainment business under Section 1–106(b) of the Zoning Code. Where the Board lacks the concurring vote of four members of the Board in favor of granting a permit, the Application must be disapproved.

Challenging that decision, on February 11, 2004, appellant filed a petition for judicial review in the Circuit Court for Baltimore City, claiming that "the Zoning Board err[ed] in failing to make adequate findings of fact and conclusions of

law sufficient to allow meaningful judicial review of its decision[,]" and that it "err[ed] in finding that petitioner did not establish a non-conforming use of adult entertainment[.]" The circuit court disagreed.

Affirming the Board's decision, that court stated:

I do find that the Zoning Board did, indeed, make a factual finding in this case. They found that there was not a lawful non-conforming use of the property on 606 or 608.
· Now, the court has to, by law, determine whether or not this factual finding is supported by competent, material and substantial evidence in order to, for lack of a better term, affirm it. And the evidence in the entire case, in light of that and the entire record that has been submitted reasonable minds could have reached the same factual conclusions as were reached by the Zoning Board.

### Discussion

Appellant contends that the failure of the Board's prevailing minority to issue findings of fact and conclusions of law, in support of their successful opposition to its request for a nonconforming use permit, constituted error. We agree.

Initially, we note that, although this is an appeal from the judgment of the circuit court, affirming the Board's decision, it is the Board's decision we review. Consequently, it is the Board's findings or, in this case, lack of findings which is at issue, not the circuit court's. *Consumer Prot. Div. v. Luskin's, Inc.*, 120 Md.App. 1, 22, 706 A.2d 102 (1998), *rev'd in part on other grounds*, 353 Md. 335, 726 A.2d 702 (1999). In reviewing the Board's decision, our role "is precisely the same as that of the circuit court." *Dep't of Health & Mental Hygiene v. Shrieves*, 100 Md.App. 283, 303–04, 641 A.2d 899 (1994). Like that court, we are " 'limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 67–68, 729 A.2d 376 (1999) (quoting

*United Parcel v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226 (1994)).

■   To make those determinations, we " 'must be able to discern from the record the facts found, the law applied and the relationship between the two.' " *Sweeney v. Montgomery County,* 107 Md.App. 187, 197, 667 A.2d 922 (1995) (quoting *Forman v. Motor Vehicle Admin.,* 332 Md. 201, 221, 630 A.2d 753 (1993)). That requires the Board to "resolve all significant conflicts in the evidence and then chronicle, in the record, full, complete and detailed findings of fact and conclusions of law." *State of Maryland Commission on Human Relations v. Malakoff,* 273 Md. 214, 229, 329 A.2d 8 (1974).

■   " '[F]indings of fact must be meaningful,' " the Court of Appeals has warned, " 'and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions.' " *Mehrling v. Nationwide Ins. Co.,* 371 Md. 40, 64, 806 A.2d 662 (2002) (quoting *Bucktail, LLC v. County Council of Talbot County,* 352 Md. 530, 553, 723 A.2d 440 (1999)). The absence of such findings, the Court of Appeals has declared, not only violates the "fundamental right of a party to a proceeding before an administrative agency to be apprised of the facts relied upon by the agency in reaching its decision," *Harford County v. Earl E. Preston, Jr., Inc.,* 322 Md. 493, 505, 588 A.2d 772 (1991), but precludes meaningful judicial review of the agency's decision. That is why the absence of adequate findings of fact "constitutes an error of law and renders the Board's decision arbitrary and capricious." *Bd. of County Commissioners for St. Mary's County v. Southern Resources Management, Inc.,* 154 Md.App. 10, 36, 837 A.2d 1059 (2003).

■   For those reasons, no principled legal distinction can be drawn between what is required of a prevailing majority in rendering its decision and that which is required of a prevailing minority in imposing its will. Otherwise, a decision, of which a majority of the Board disapproves, would in effect escape judicial scrutiny while, paradoxically, a decision, of which the entire Board approves, would not. That result of

course undermines the whole point of judicial review. Therefore, we hold that, just as a prevailing majority must do, a prevailing minority must, after "resolv[ing] all significant conflicts in the evidence," *Malakoff,* 273 Md. at 229, 329 A.2d 8, issue findings of fact and conclusions of law. In the event there is a conflict between members of the prevailing minority as to the factual findings to be made or the legal conclusions to be drawn, that should not prevent them from stating all joint and individual findings of fact and conclusions of law, which support their common decision to deny an application for a nonconforming use.

In this case, a majority of Board members, three out of five, "found that the use of only 608 W[est] Lexington Street one night a week was legally established prior to September 10, 1993, and should be allowed to continue . . ." Two members disagreed, and because, under Article 66B § 2.08(i), a supermajority was required for approval,[6] they prevailed. As to why two Board members disapproved appellant's application, the Board's decision merely states that they believed "that there was insufficient evidence to conclude that the nonconforming use was established and that the use complie[d] with the definition of an adult entertainment business under Section 1–106(b) of the Zoning Code." No other findings of fact were made, despite conflicting evidence. What is more, the evidence, if viewed in a light most favorably to the appellant, did arguably provide a basis upon which to grant appellant's application. It suggested that appellant had, in

---

6. Md.Code, Art. 66B, § 2.08(i) provides:

(i)(1) If five members of the Board of Municipal and Zoning Appeals are present, the concurring vote of at least four members is necessary to:

(i) Reverse any order, requirement, decision, or determination of an administrative officer;

(ii) Decide in favor of the applicant on any matter on which it is required to act under an ordinance; or

(iii) Effect any variation in an ordinance.

(2) If only four members of the Board are present, the concurring vote of at least three members is necessary to take any action under this subsection.

fact, established a nonconforming use on its premises, dating back to 1990.

A "nonconforming use," under § 13–101, is defined as "any lawfully existing use of a structure that does not conform to the applicable use regulations of the district in which it is located." Because under the zoning code, "[a]ny adult entertainment business existing on September 10, 1993, is considered a nonconforming use . . . ," the facts at issue are: (1) whether appellant conducted an adult entertainment business; (2) whether that business lawfully existed on September 10, 1993; and (3) whether it has continued, without interruption, since that date.[7] In short, the question is whether appellant has continuously presented nude or partially nude entertainment since September 10, 1993.

Three witnesses testified that appellant has presented adult entertainment at Club Bunns, in the form of nude or partially nude live performances, since 1990. As previously introduced, they were: Renold Owens, the past manager and now, with his brother, Dana Owens, the current owners of the bar; Carl Scheffel, whose company, S.T.S., Inc., previously owed the bar and is presently appellant's landlord; and Wayne Jeffries, a current employee of the bar, who has worked there for the past fifteen years.

Owens testified that the bar began offering adult entertainment business in 1989, consisting of topless dancers wearing G-strings or "bikini bottom[s] of some kind," but, on occasion, they were totally nude. Scheffel gave similar testimony. He asserted that the bar began offering adult entertainment no later than 1990. That entertainment, he stated, consisted of "risque dancing," "semi-naked dancing," "bikinis," or "strip shows." Jeffries testified in a similar vein. He stated that, since 1990, the bar has offered adult entertainment in which the dancers would shed their clothes down to a bikini, some-

---

7. Baltimore City Zoning Code § 13–407 provides the applicable rules for determining whether a Class II nonconforming use of a structure has been discontinued or abandoned.

times with "something hanging . . . down," "glued on their . . . breasts," while their "bottoms was [sic] covered."

Moreover, bikini-clad dancers, appellant maintains, fall within the definition of "adult entertainment." In support of this proposition, it points to the definition of partial nudity in § 1–106(a)(4), which states that "[p]artial nudity means a state of dress in which opaque clothing covers no more than: (i) the human male or female genitals, pubic area, or buttocks; (ii) the female breasts below the top of the nipples; and (iii) portions of the body covered by supporting straps or devices." That definition, it asserts, encompasses the bikini, commonly worn by its dancers.

In addition to the testimony of these three witnesses, appellant introduced a letter from the liquor board and two of the liquor board's index card records. The letter, dated April 20, 1990, approved "live male or female revue type entertainment one night per week" at 608 West Lexington Street, which, appellant claims, meant "adult entertainment." Moreover, the index card record dated April 5, 1990, confirmed that such approval had been granted for 608, and the other index card record, dated November 25, 1991, indicated that the liquor license had been transferred from 608 to "606–608" West Lexington Street. In sum, if viewed in a light most favorable to appellant, the testimony and documentation presented by appellant suggest that, when § 1–106(a)(4) is construed as appellant proposes, adult entertainment, in the form of at least partial nudity, has been presented by appellant since at least 1990 and has continued uninterrupted to the date of appellant's application.

In conflict with this evidence were the statements of Renold Owens's brother, Dana Owens, and appellant's attorney at the August 21, 2001 liquor board hearing, as well as appellant's 2001 use permit application. At that hearing, Dana Owens stated that the dancers at Club Bunns "are not showing any body parts, absolutely no personal body parts are shown at our shows," explaining "this [liquor] board has told us, make certain that there is no nudity in any of your shows." "We

don't have it," he stressed. Also, at that hearing, appellant's counsel stated, "they [the dancers] have been doing live entertainment, never adult entertainment ... they [appellant] never had adult entertainment in their business." Moreover, appellant's 2001 permit application, requesting a change in the use for 606–608 from "tavern" to "tavern including live entertainment and dancing," stated, in handwritten block letters, "NO ADULT ENTERTAINMEN[T]," though appellant claims that that language was added to the application by "zoning officials" because "they knew at that point there had to be a hearing on the adult entertainment issue."

Yet, despite this evidence, the prevailing minority made no findings as to whom or what it believed, how it interpreted the records presented or the controlling statutes involved. In other words, we do not know whether the minority found the evidence of the establishment of a nonconforming use insufficient because of gaps in the supporting evidence or because it interpreted that evidence differently than the majority did or because it found that evidence either too ambiguous or too incredible to be worthy of belief. Nor do we even know what definition of adult entertainment the minority applied. Without this information, we have no way to ascertain whether the prevailing minority's decision is the product of error or not.

Because we are unable to determine, and unwilling to speculate, how the minority reached the result that it did, we must remand this case to the circuit court with the instruction that it, in turn, remand this matter to the Board to give the prevailing minority the opportunity to issue the appropriate findings of fact and conclusions of law.

**JUDGMENT VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND THE CASE TO THE BALTIMORE CITY BOARD OF MUNICIPAL AND ZONING APPEALS FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**